IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WAYNE LELA and JOHN MCCARTNEY, ) | |
| ) | |
| Plaintiffs, ) | No. 14 CV 5417 |
| v. ) | |
| ) | Judge Robert W. Gettleman |
| BOARD OF TRUSTEES OF COMMUNITY ) | |
| COLLEGE DISTRICT NO. 516, ) | |
| ) | |
| Defendant. ) | |

## AMENDED MEMORANDUM OPINION AND ORDER

Plaintiffs Wayne Lela and John McCartney have filed a five-count complaint against the Board of Trustees of Community College District No. 516, alleging that Waubonsee Community College ("WCC"), a public college which is administered by defendant, violated plaintiffs' First Amendment rights when it denied plaintiffs' request to hand out flyers on the school's campus. Plaintiffs complain that: (1) WCC's Use of College Facilities and Services policy facially constitutes viewpoint discrimination (Count I); (2) WCC's Solicitation and Ethics policies as applied to plaintiffs constitute viewpoint discrimination (Count II); (3) WCC's Use of College Facilities and Services and Solicitation policies are overly broad (Count III) and vague (Count IV) in violation of the First Amendment; and (4) WCC's Solicitation policy constitutes unconstitutional prior restraint under the First Amendment and Article 1, Section 4 of the Illinois Constitution (Count V).[1] On July 30, 2014, plaintiffs filed the instant motion for preliminary injunction, seeking to bar defendant from prohibiting their free speech activity on campus. An evidentiary hearing was held on plaintiffs' motion on December 5, 2014. The preliminary

---

[1] Plaintiffs' complaint misnumbers the counts so that Count V is improperly labeled Count VI.

injunction motion has also been fully briefed, including a sur-reply submitted by defendant and post-hearing briefs submitted by both parties.  For the reasons stated on the record, and as discussed below, the court grants plaintiffs' motion for a preliminary injunction.

## BACKGROUND

Plaintiffs contend that on or about January 16, 2014, plaintiff Lela contacted WCC requesting to distribute flyers on the school's Sugar Grove campus.  Lela was referred to WCC employee Debby Wilhelmi, who asked to see copies of the leaflets plaintiffs intended to distribute.  Plaintiffs provided Wilhelmi with two flyers: "The Uncensored Truth About Homosexuality;" and "'Gay' Activism and Freedom of Speech and Religion."  Both flyers promote an anti-homosexuality message.  The flyers were sponsored by Heterosexuals Organized for a Moral Environment ("H.O.M.E."), an organization founded by Lela.  On January 21, 2014, Lela received a letter from WCC's Executive Vice President of Finance and Operations, David Quillen, denying Lela's request to distribute flyers at the college.  Quillen's letter stated that WCC "is not an open public forum" and that "[t]he college consistently limits campus activities to events that are not disruptive of the college's educational mission."

The letter also referenced the fact that plaintiffs had been provided copies of WCC's Solicitation Policy and Use of College Facilities and Services Policy (the "Facilities Policy"). The Facilities Policy provides that "[c]ollege facilities may be made available to college and non-college sponsored programs, provided the use does not interfere or conflict with the normal operations or educational programs of the college; the use is consistent with the philosophy, goals and mission of the college; and the use conforms to federal, state, local laws and ordinances."  The school's Solicitation Policy states that "any type of solicitation, including but

2

not limited to, commercial, charitable, political, . . . , using college buildings, equipment, services or grounds is prohibited unless there is written approval from the president or a designated representative of the president."

On February 28, 2014, a staff attorney at The Rutherford Institute sent a letter on behalf of plaintiff Lela to Quillen, asserting that the school's refusal to allow Lela to pass out flyers was in violation of the First Amendment and demanding that the denial be rescinded. The letter further stated that the Solicitation Policy was unconstitutional and that the school had engaged in impermissible viewpoint discrimination. On March 13, 2014, outside counsel for defendant responded to The Rutherford Institute, maintaining that "H.O.M.E. will not be granted access to utilize campus property to pass out solicitation flyers" because, pursuant to the school's policy, "solicitation of any kind . . . is prohibited on campus." The letter also explained that H.O.M.E.'s message "is in direct conflict with and disruptive of the College's mission to uphold and adhere to the legal requirements for maintaining a non-discriminatory educational environment, free of unlawful hostility."

Plaintiffs were permitted to leaflet on WCC's Sugar Grove campus on two prior occasions, once in 2003, and again in 2005.[2] During both visits the college arranged for plaintiffs to be on campus for two consecutive days from 10:00 a.m. to 3:00 p.m. The college

---

[2] The court is concerned that defense counsel may have tried to mislead the court regarding plaintiffs' prior visits to WCC's campus. In defendant's response brief, defense counsel stated, "assuming, arguendo, that Lela's [prior] campus visit actually took place, *about which the College denies any knowledge*, one isolated incident *allegedly* occurring over five years ago is irrelevant for purposes of this Court's consideration of the viability of Plaintiff's Complaint and their right to a preliminary injunction." (Emphasis added.) Directly contradicting this statement, defense counsel subsequently submitted exhibits establishing that plaintiffs had been given access to WCC's campus on at least two prior occasions. In fact, one of the exhibits was a 2007 letter written by this same defense counsel to plaintiffs.

provided plaintiffs with a table and two chairs from where they distributed their leaflets to students who initiated conversation. In 2003, plaintiffs were located in Dickson Hall, and in 2005, they were stationed in Bodie Hall. Plaintiffs requested to conduct the same sort of leafleting on WCC's campus in 2007, but were denied access.

## **DISCUSSION**

Defendant contends that the decision to deny plaintiffs access to WCC's campus did not run afoul of the First Amendment because WCC is not an open public forum and the decision was based on WCC's Solicitation, Facilities, and anti-discrimination policies, which are content-neutral and apply the same standards to all groups. The court disagrees. It is undisputed that WCC permits outside groups, including four-year colleges, to engage in speech activities on its campus. While this does not make the college an open public forum, it does require that WCC not discriminate against outside groups based on the content of their speech. See, e.g., Gilles v. Blanchard, 477 F.3d 466, 470 (7th Cir. 2007) ("The courts reject the proposition that a campus must make all its facilities equally available to students and nonstudents alike, or that a university must grant free access to all of its grounds or buildings," but "a university that decide[s] to permit its open spaces to be used by some outsiders [can]not exclude others just because it disapprove[s] of their message.").

Defendant relies heavily on WCC's Solicitation Policy to argue that plaintiffs, regardless of their message, are not permitted to leaflet on campus because such activity falls under the school's blanket ban on solicitations. The constitutionality of a solicitation policy similar to WCC's policy has previously been questioned by the Seventh Circuit. In Blanchard, the court found that application of Vincennes University's solicitation policy to the plaintiff, a traveling

4

evangelist, was "hopelessly vague and thus a supple weapon for excluding . . . outsiders whose message the university disapproves of." Id. at 472. Similarly, WCC's policy, as interpreted by defendant to cover plaintiffs' activities, is suspect.

Although defendant argues that plaintiffs' speech is political, and therefore explicitly banned by the college's Solicitation Policy, there is nothing political about plaintiffs' speech. Plaintiffs' leaflets do not discuss a particular political ideology or align with a political party, nor do they promote a candidate or public official, or solicit any action by anyone. Moreover, if the court were to accept the definition of solicitation offered by defendant at the preliminary injunction hearing – "an active attempt to influence student thinking," – nearly any type of speech could be considered solicitation, and therefore barred by defendant. As discussed in Blanchard, "[t]o solicit, in law as in ordinary language, is to ask someone to do something, usually of a commercial or quasi-commercial character, for the solicitor." Id. at 471. Because plaintiffs' request to leaflet at WCC was not a request to engage in solicitation, application of the school's Solicitation Policy to bar plaintiffs from campus was not appropriate.

Defendant also argues that plaintiffs were denied access to WCC because they failed to follow the college's Facilities Policy, which requires outside groups to fill out a facilities contract to rent a room from the school. However, defendant's communications with plaintiffs at the time of their request bellies this assertion. Not once during the multiple exchanges between WCC personnel and plaintiffs were plaintiffs told that they needed to fill out a facilities contract. As such, it is clear that the college's decision to deny plaintiffs access to the school was not based on plaintiffs' failure to follow the school's Facilities Policy.

After initially denying that plaintiffs had previously been permitted to leaflet at WCC, defendant now argues that the college was justified in denying plaintiffs' 2014 request because of a disturbance associated with plaintiffs' visit to campus in 2005. The hearing testimony established that during one of the two days plaintiffs were on WCC's campus in 2005, a group of students protested their presence and message. For plaintiffs' protection, campus police escorted plaintiffs to their vehicles at the end of their scheduled leafleting time. There was no evidence that plaintiffs acted inappropriately or disruptively during the visit. In fact, plaintiffs complied with school rules to remain behind their table and allow students to initiate discussions. Based on this incident, defendant argues that "notice that even one student was offended and disrupted by Plaintiffs' presence on campus provides grounds for the College to take action to ensure that such harm will not reoccur or be perpetuated in the future."

This argument flies in the face of First Amendment jurisprudence. As has been repeatedly held, "yielding to a 'heckler's veto' infringes a speaker's free speech." Blanchard, 477 F.3d at 471; see also Church of American Knights of the Klu Klux Klan v. City of Gary, Indiana, 334 F.3d 676, 681 (7th Cir. 2003); Terminiello v. City of Chicago, 337 U.S. 1, 4-5 (1949). First Amendment rights cannot be vetoed by listeners who, in disapproving of the message, create a disturbance, thereby silencing the speaker. As the Supreme Court held more than half a century ago, free speech may "best serve its high purpose when it induces a condition of unrest . . . or even stirs people to anger." Terminiello, 337 U.S. at 4. Defendant's concern that plaintiffs' presence on campus may cause a negative student response or disturbance was not

6

a constitutional ground for denying them access to WCC. Indeed, provocative speech is entitled to the same protection as speech promoting popular notions.[3]

Finally, and most important to the court's analysis, defendant argues that WCC's anti-discrimination policy permissibly bars plaintiffs from leafleting on campus. Defendant contends that plaintiffs' message is "demeaning to a protected class at the College . . . which the College cannot condone because it is contrary to the College's mission." Defendant explains that because of this, "the College exercised its discretion to avoid harm to any members of the College community who could be targeted by the Plaintiffs['] comments." Moreover, in a letter to plaintiffs responding to their 2014 request, defense counsel explained that plaintiffs' application to utilize campus property was denied because H.O.M.E.'s anti-homosexuality message was "in direct conflict with and disruptive of the College's mission to uphold and adhere to the legal requirements for maintaining a non-discriminatory educational enforcement, free of unlawful hostility." Reliance on WCC's anti-discrimination policy to bar plaintiffs from leafleting controverts defendant's argument that the decision to reject plaintiffs' request was content-neutral. Instead, the content of plaintiffs' speech, which the school considered to violate its anti-discrimination policy, was the precise basis for WCC's decision. Consequently, the court finds that defendant discriminated against plaintiffs based on the content of their speech.

---

[3] As has been stated numerous times in a variety of forums, it is not popular ideas, accepted by all, that need protecting. It is unpopular, even offensive, ideas that our most closely held constitutional right seeks to shelter. See generally, Terminiello, 337 U.S. at 4 (overturning city ordinance that banned speech that "stirred people to anger, invited public dispute, or brought about a condition of unrest.").

**1.      Preliminary Injunction**

Plaintiffs have asked this court to preliminary enjoin defendants from further discriminating against them. A preliminary injunction is an "extraordinary remedy" and may be issued only if the moving party demonstrates: (1) some likelihood of success on the merits; (2) an inadequate remedy at law; and (3) an irreparable harm if the injunction is denied. Indiana Civil Liberties Union v. O'Bannon, 259 F.3d 766, 770 (7th Cir. 2001). If these elements are met, the court must then balance the irreparable harm the non-movant will suffer if the injunction is granted against the irreparable harm to the moving party if relief is denied. Id. "The 'equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor.'" Wisconsin. Right to Life, Inc. v. Barland, 751 F.3d 804, 830 (7th Cir. 2014), quoting Korte v. Sebelius, 735 F.3d 654, 665 (7th Cir. 2013). The court must also consider the interests of the public in determining whether to issue a preliminary injunction. O'Bannon, 259 F.3d at 770.

Defendant spends a considerable portion of its response brief discussing the elevated burden placed on plaintiffs where a mandatory preliminary injunction is sought. However, as previously noted by the court, the equitable relief sought here does not constitute a mandatory injunction. A mandatory injunction requires the defendant to take an affirmative action. Graham v. Medical Mut. of Ohio, 130 F.3d 293, 295 (7th Cir. 1997). A survey of the cases cited by defendant reveals that the relief plaintiffs request does not qualify as an affirmative act. Jordan v. Wolke, 593 F.2d 772 (7th Cir. 1978) (preliminary injunction requiring jail to allow contact visits); Global Relief Found., Inc. v. O'Neill, 207 F. Supp. 2d 779 (N.D. Ill. 2002) (preliminary injunction requiring defendant to unfreeze assets and return property); Kartman v.

State Farm Mut. Auto Ins. Co., 634 F.3d 883 (7th Cir. 2011) (preliminary injunction seeking to have insurance company reinspect claim holders' homes); ChoiceParts, LLC v. General Motors Corp., 203 F. Supp. 2d 905 (N.D. Ill. 2002) (preliminary injunction requiring defendant to provide auto parts data); W.A. Mack, Inc. v. General Motors Corp., 260 F.2d 886 (7th Cir. 1958) (preliminary injunction seeking specific performance of contracts). Contrary to defendant's assertion, the preliminary injunction sought does not "bestow[] a new status on the Plaintiffs," nor require defendant to take affirmative action, but instead merely asks the court to bar defendant from violating plaintiffs' First Amendment rights.

Given the court's finding that defendant discriminated against plaintiffs based on the content of their speech, the court finds that plaintiffs have a high likelihood of success on the merits. Likewise, the court rejects defendant's arguments that plaintiffs have not established the second and third requirements for issuing a preliminary injunction.

Defendant contends that plaintiffs have an adequate legal remedy because they can enter into a facilities contract with WCC, which will entitle them to rent a room in a building on WCC's campus. Defendant argues that "[i]f Plaintiffs applied for and were rejected use of space; or if they were granted use and the College in some way breached some aspect of the Facilities Contract, Plaintiffs would have an adequate remedy at law in terms of a breach of contract claim." This argument is misguided because money damages are always inadequate where First Amendment rights are at stake. Joelner v. Village of Washington Park, Illinois, 378 F.3d 613, 620 (7th Cir. 2004). Plaintiffs are not seeking to redress contractual rights, but to vindicate alleged constitutional violations.

9

Moreover, it is unclear from the hearing testimony whether plaintiffs would be permitted to rent a room at the college for purposes of passing out their flyers. WCC's Executive Vice President of Finance and Operations, David Quillen, first testified that he would rent a room to plaintiffs to pass out flyers if they followed the necessary procedures requiring them to sign a facilities contract. However, moments later, Quillen testified that even if plaintiffs had initially filed out a facilities contract he would not have rented them a room because the flyers they sought to distribute violated WCC's anti-discrimination and solicitation policies. Upon further questioning, Quillen changed his response yet again, stating that plaintiffs would have been allowed to rent a room, but that "disclaimers" would be placed on the room's door. Defense counsel then asked Quillen: "If the plaintiffs complete the contract, they are given a room, and there is a defined group of people in there who want to be in the room, and they exchanged the literature, would that be in violation of your nondiscrimination policy if all the individuals are consenting to the exchange of this information?" In response, Quillen stated that plaintiffs would then be in compliance with the school's policies because it was a consenting group of students participating in the exchange with plaintiffs. Given this confusing, inconsistent, and incredible testimony by one of defendant's key witnesses, the court concludes that defendant's refusal to allow plaintiffs to leaflet anywhere on campus was content based, absolute, and thus unconstitutional.

Defendant also argues that plaintiffs have not established irreparable harm. As has been held numerous times by courts in this district, the loss or impingement of freedoms protected by the First Amendment, "'even for minimal periods of time, unquestionably constitutes irreparable injury,'" Am. Civil Liberties Union of Illinois v. Alvarez, 679 F.3d 583, 589 (7th Cir. 2012),

quoting Elrod v. Burns, 427 U.S. 347, 373 (1976) (plurality opinion). While defendant argues that "[t]he mere 'assertion' of First Amendment rights does not automatically require a finding of irreparable harm," as discussed at length above, plaintiffs have not merely asserted a constitutional violation, but instead have established that defendant engaged in unconstitutional viewpoint discrimination. Plaintiffs certainly have suffered a loss, and there has clearly been a "chilling effect on free expression" because of defendant's "purposeful unconstitutional suppression of speech." Hohe v. Casey, 868 F.2d 69, 73 (3d Cir. 1989).

Because plaintiffs have made the threshold showing for a preliminary injunction, the court must now assess "whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." Alvarez, 679 F.3d at 589. Where "the moving party has establishe[d] a likelihood of success on the merits," as is the case here, "the balance of harms normally favors granting preliminary injunctive relief," because "injunctions protecting First Amendment freedoms are always in the public interest." Id. at 589-90. (Internal citations omitted.) Contrary to defendant's contentions, and as discussed above, fear of a disturbance does not tilt the scale in defendant's favor. While the court appreciates defendant's duty to keep WCC students safe, there is absolutely no evidence that plaintiffs pose any sort of threat to the student body. Concerns related to the violent tragedies that have occurred on school campuses across the country cannot justify defendant's content-based discrimination against speech.[4] Moreover,

---

[4] Defendant's witnesses testified repeatedly about the need to enforce WCC's Solicitation and Facilities policies to secure the campus in light of violent acts carried out at other colleges. WCC's Vice President of Student Affairs, Melinda James, testified that the school was prompted to adopt new rules concerning student organizations and outside groups in

(continued...)

there is no reason to believe, as defendant suggests, that plaintiffs' time on campus would be completely unrestricted. As established at the hearing, plaintiffs are willing to abide by reasonable time, place, and manner restrictions, as they did during previous visits.

Finally, defendant argues that an injunction would conflict with its federal obligations to keeps its campus free of discrimination. In support of this argument, defendant points to Quillen's testimony that "if the College were to endorse the discrimination advocated by Plaintiffs, in contravention of federal non-discrimination regulations, the College 'could lose eligibility to provide federal financial aid,' which would harm the college immensely." Defendant's contention is severely flawed. Allowing plaintiffs to exercise their First Amendment rights on WCC'c campus does not amount to the college endorsing plaintiffs' views or speech. In fact, as plaintiffs point out, the United States Department of Education's Office for Civil Rights has publically stated that its policies should not be carried out in ways that impair First Amendment rights. See U.S. Department of Education, Office for Civil Rights,"First Amendment: Dear Colleague," 28 July 2003, available at http://www2.ed.gov/about/offices/list/ocr/firstamend.html (clarifying that colleges and universities should not interpret the Office for Civil Right's prohibitions against discrimination and harassment "as encompassing all offensive speech regarding sex, disability, race, or other

---

[4](...continued)
response to the Virginia Tech and Northern Illinois University shootings. Likewise, WCC's Chief of Campus Police, J.C. Paez, testified that "there's been a heightened amount of violence on campuses across the nation over the last [few] years," increasing the need to monitor outside visitors. In its post-hearing brief, defendant highlights recent college shootings, arguing that allowing plaintiffs to leaflet on campus would elevate security concerns "regarding campus control and the potentially high risk of danger for students, staff, and visitors."

classifications."). Consequently, the court finds that the balance of harms greatly favors plaintiffs, and that plaintiffs have established their right to preliminary injunctive relief.

## CONCLUSION

For the reasons discussed above, the court grants plaintiffs' motion to preliminarily enjoin defendant from denying plaintiffs access to WCC for purposes of leafleting. Defendant is ordered to submit to the court a written proposal for a reasonable time, place, and manner for such leafleting, consistent with this opinion, on or before January 26, 2015. This matter is set for January 28, 2015, at 1:30 p.m., at which time the court will enter a definitive preliminary injunction order.

**ENTER:** **January 27, 2015**

_____
**Robert W. Gettleman**
**United States District Judge**